IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| TINA RAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:17-cv-00093 |
| | ) | |
| MICHAEL ROANE, | ) | By: Elizabeth K. Dillon |
| | ) | United States District Judge |
| Defendant. | ) | |

**MEMORANDUM OPINION**

The defendant in this case, Michael Roane, is an Augusta County deputy sheriff.[1] Roane shot and killed a large dog that was in Tina Ray's yard, after he responded to Ray's home, got out of his vehicle, and the dog approached him in the yard, barking at him. Roane asserts that he did so in self-defense. Ray contends that the dog was on a zip-lead (although a long one strung up between two trees) and could not have reached Roane at the time he shot it. All claims in this lawsuit arise from this same incident.

Pending before the court are three pending motions, all filed by Roane. The first is Roane's motion to dismiss, in which he contends both that he is entitled to qualified immunity and that the complaint should be dismissed in its entirety because it fails to state a claim. (Dkt.

---

[1] Including this lawsuit, there are at least four lawsuits in this court that have been brought by Nexus or by persons represented by Nexus attorneys and that have named Roane as a defendant. In addition to this case, he was named in *Nexus Servs., Inc. v. Moran*, No. 5:16-cv-35 (W.D. Va.); *Watford v. Roane*, No. 5:17-cv-62 (W.D. Va.); and *Varner v. Roane*, No. 5:17-cv-80 (W.D. Va.). According to documents submitted with defendant's answer, moreover, Nexus and its CEO, Mike Donovan, have been active in trying to get Roane terminated from his position. (*See, e.g.*, Dkt. Nos. 5-7; 5-8.) Based on these background facts, defense counsel characterizes this lawsuit as a "strike suit." (Def.'s Mem. Supp. Mot. to Dismiss 4, Dkt. No. 4.) The court acknowledges that Nexus or its president appear to have sought opportunities to name Roane as a defendant in lawsuits and that they have publicly expressed animosity toward Roane. But the court cannot conclude that the facts here—in which Roane admittedly shot and killed a dog who was on a lead at the time—are so frivolous that the suit should be characterized as a strike suit. *See also infra* at Section II.D. (denying defendant's motion for sanctions). The court further notes that, although plaintiff's counsel initially listed his law firm as Nexus Caridades Attorneys, Inc., counsel now works for a different entity that is allegedly independent from Nexus or its family of companies: Nexus Derechos Humanos Attorneys, Inc.

No. 3.) The second is a motion for sanctions (Dkt. No. 16), which is based primarily on Roane's allegation that Ray included knowingly false statements in the complaint and continued to assert those statements despite documents filed with the answer and an audio recording from the day of the incident, in which Ray made a number of statements that directly contradict her lawsuit's allegations. The third motion is styled as a "motion for relief" (Dkt. No. 22), and it also asks for dismissal of the lawsuit, or other appropriate sanction, on the ground that plaintiff failed to comply with the court order directing her to file a reply to defendant's answer. As a sanction, Roane requests that the court "take appropriate action to enforce its Order, including dismissal of this action on the basis of qualified immunity." (*Id.* at 1.)

In her response to the third motion, Ray argues that she followed the court's directions and that her reply was adequate to address Roane's assertions of qualified immunity. In a footnote, counsel also accuses defense counsel of "abus[ing] this court and plaintiff" and states that this abuse "should be addressed by this Court." (Resp. to Mot. for Relief 5–6 n.1, Dkt. No. 26.) Ray has not filed any separate motion for sanctions, however. Thus, the three motions described above are the only pending motions before the court. All have been briefed, were argued before the court at a hearing, and are ripe for disposition.

Because the court concludes both that Roane's actions were reasonable and that Roane is entitled to qualified immunity on the federal claim, it will grant the motion to dismiss that claim. With regard to the state-law claims, the court will decline to exercise jurisdiction over those claims. For the reasons set forth in this opinion, the court will also deny the motion for sanctions and deny as moot the motion for relief.

## I.  BACKGROUND[2]

In the late morning on September 24, 2017, four Augusta County Sheriff's Office deputies drove to Tina Ray's residence.  They were there in order to serve her with an arrest warrant and protective order.  At some point after their arrival, Investigator Roane also arrived at the residence.  When he did, Ray's dog, Jax,[3] was in her front yard, which also contained a trampoline and an above-ground pool.  Jax is a very large dog, weighs approximately 150 pounds, and looks similar to a German Shepherd.  Jax was tied to a twenty-five foot zip-lead, and the lead was attached to a wire that stretched between two trees in the yard.  Thus, Jax could run past either of the trees for approximately twenty-five feet before the lead would reach its end.

According to the complaint, the other deputies had parked their cars on the street, but Roane drove down Ray's driveway and stopped suddenly in the yard, directly next to one of the trees that was connected to the lead that restrained Jax.

Ray's complaint alleges that Jax was "alarmed" as soon as Roane exited his truck and slammed the door.  As Roane got out of his truck, Jax "began barking while approaching Roane," although Ray denies Jax was "charging" or in any kind of attack mode.  She further alleges that Roane began backing away from the dog, although she denies that Roane was *running* backward away from the dog.  Ray alleges that, "in a short moment Jax had reached the end of his line and could not get any closer to Roane."  At that point, Roane stopped backing up because he saw that Jax could not get any closer and saw that Ray was holding on the fully-extended zip-lead and yelling Jax's name.  Roane "calmly, with an expressionless face, took a step towards the dog, . . . put his gun to the dog's head at point blank range, and shot" it.

---

[2]  The court takes these facts from Ray's complaint.  (Dkt. No. 1.)

[3]  Defendant denies that the dog belonged to Ray and instead claims that the dog belonged to her estranged husband.  For purposes of the motion to dismiss, however, the court credits the allegations in the complaint.

(Compl. ¶ 4.)[4] Roane fired a single shot at Jax, striking him in the head, and the shot eventually killed the dog.

The complaint contains four claims, although Ray has since abandoned the second, her substantive due process claim.[5] This leaves three claims in the case:

1. A claim under 42 U.S.C. § 1983, alleging a violation of Ray's Fourth Amendment rights because Roane "unlawfully seized her personal property";
2. A claim for conversion under Virginia law; and
3. A claim for intentional infliction of emotional distress under Virginia law.

Ray's complaint also seeks attorney fees and punitive damages. At the time Roane filed his Answer (Dkt. No. 5), he requested that plaintiff be required to file a reply to the Answer (Dkt. No. 6), pursuant to Federal Rules of Civil Procedure 7(a)(7) and 12(a)(1)(C). Plaintiff did not object to doing so, and the court directed that she file a reply to the answer. (Dkt. No. 18.) She thereafter filed her reply, which specifically addressed Roane's assertion that he is entitled to qualified immunity. (Reply to Ans., Dkt. No. 20.)

II. DISCUSSION

A. Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff's allegations must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard "requires the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling

---

[4] Roane's Answer paints a slightly different picture, although many of the facts are the same. He claims that he was running backward, as the dog ran toward him while "growling, barking, and chomping with its mouth." Roane claims that he believed the dog had broken free from its lead and, in order to protect himself from serious physical injury, he had no choice but to protect himself and that the only means he had at his disposal to do so was his gun, so he pulled out his gun and fired one shot at the dog, hitting it in the head. (Answer ¶ 4.)

[5] Ray has indicated that she "will not pursue her substantive due process claim." (Pl.'s Resp. to Mot. Dismiss 21 n.2, Dkt. No. 11.) Based on this, the court will grant the motion to dismiss that claim by agreement.

him to relief, *i.e.*, the 'plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). The plausibility standard requires more than "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

In determining whether the plaintiff has met this plausibility standard, the court must accept as true all well-pleaded facts in the complaint and any documents incorporated into or attached to it. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Further, it must "draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), but it "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments,'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

**B. Fourth Amendment Seizure Claim**

    **1. Roane did not act unreasonably.**

Roane argues both that the complaint fails to state a Fourth Amendment claim and that the federal claim should be dismissed on the alternative basis of qualified immunity. As to the former, he argues that the seizure here was not "unreasonable" and thus that there is no viable Fourth Amendment claim. (Def.'s Mem. Supp. Mot. Dismiss 6, Dkt. No. 4 (citing *Monroe v. City of Charlottesville*, 579 F.3d 380, 386 (4th Cir. 2009).) As Roane correctly notes, whether a seizure was unreasonable is an "objective determination," and based on the "facts and circumstances confronting [the officer] without regard to [his] underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Also, the officer's conduct "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The Supreme Court also has instructed that "[t]he calculus of reasonableness

5

must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

In evaluating similar types of claims, the Fourth Circuit has noted that the safety of law enforcement officers is a governmental interest of paramount importance. *Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009). Thus, in several dog-shooting cases in which an officer's reaction was held to be reasonable (and therefore not a Fourth Amendment seizure), the courts emphasized officer safety concerns. *See, e.g.*, *Schutt v. Lewis*, No. 6:12-cv-1697, 2014 WL 3908187, at *3 (M.D. Fla. August 11, 2014) ("The touchstone for reasonableness in dog-shooting cases is typically officer safety . . . ."); *Dziekan v. Gaynor*, 376 F. Supp. 2d 267, 272 (D. Conn. 2005) (explaining that where an officer "could have reasonably assumed that the dog posed an imminent threat to his safety," his shooting of the dog was not an unreasonable seizure).

There are a number of facts in the complaint that lead the court to conclude that the seizure here was reasonable and thus that the claim should be dismissed. This is especially true given that a determination of reasonableness under the Fourth Amendment is an objective inquiry, and so the court does not need to determine or rely on what Roane was or was not thinking. Viewing the facts in the complaint in that light, they include: (1) Jax was a large dog weighing approximately 150 pounds; (2) Jax was "alarmed" by Roane's arrival and by the slamming of his truck door; (3) Jax was "barking while approaching Roane," and Roane responded by moving backward, away from the dog; and (4) that the entire incident took only a "short moment." Although plaintiff then says that Jax reached the end of his lead and that Roane "knew" that fact when he stepped forward and shot Jax with a single shot, the court concludes

6

that an objectively reasonable officer would have felt threatened in the circumstances immediately preceding the shot and, having to make a split-second decision, might not have been sure that Jax no longer posed a threat.

Ray repeatedly focuses on her allegation that Roane "knew" Jax was at the end of his lead and stepped forward to shoot him. She also points to the allegations in the complaint that she was "controlling Jax's lead" and "summoning" him, and her allegation that Roane saw her doing so. (Compl. ¶ 34.) She emphasizes that Roane's knowledge that Jax posed no threat is demonstrated by her allegation that he "calmly, and without expression, stepped towards Jax" and shot him at point blank range." (*Id.* ¶ 39.)[6] These facts alone are not dispositive, however. As already noted, the court views the incident from the perspective of an objective, reasonable "officer" faced with making a quick decision. Further, the fact that Roane was able to act calmly in the face of danger does not mean that he did not assess Jax to be a threat. Moreover, at the time Roane fired his weapon, the dog was within one step of Roane, which proximity suggests a reasonable belief that the dog was an immediate threat.

The court believes that the facts here are similar to the circumstance in *Schutt v. Lewis*, No. 6:12-cv-1697, 2014 WL 3908187 (M.D. Fla. Aug. 11, 2014), in which the court determined that the officer acted reasonably in shooting a dog. There, an officer knocked on a door and then stepped back onto the lawn. He heard barking, and when the plaintiff opened the door, her two American Boxers exited the house. She called the dogs back, but only one of them came back to her. The other ran toward the officer. The officer stepped back and unholstered his gun, and the

---

[6] Many of these facts are belied by Ray's statements in the recording produced by defendant, in which she tells Roane that she did not know he had gotten out of his car until she heard the shot. Clearly, if she had been summoning Jax and holding onto his lead, she would have noticed him moving toward Roane and Roane moving backward. Nonetheless, the court will credit the allegations of the complaint, as it must, in ruling on the motion to dismiss.

plaintiff grabbed the dog's hind legs stopping its advance. Nevertheless, the officer shot the dog three times, killing it. The incident lasted four seconds.

Based on these facts, the court held that it was not an unreasonable seizure. The court explained, "While in retrospect, trusting [the owner] to keep [the dog] at bay or attempting to use less lethal force may have been preferable to shooting [the dog], an officer's response need not be the best possible reaction under the circumstances to be considered reasonable." *Id.* at *3 (citing *Altman v. City of High Point, N.C.*, 330 F.3d 194, 207 (4th Cir. 2003)).

Similarly, based on the facts in the complaint, which include Jax's large size and his proximity to Roane, the fact that Jax was on a lead that Roane might or might not have trusted to hold Jax, it was not unreasonable for him to shoot the dog. This is true despite the fact that Ray alleges she was holding Jax's lead and summoning him, just as the officer in *Schutt* acted reasonably in shooting the dog, despite the fact that the owner was holding its hind legs.

Whether or not an officer's actions were "reasonable" will be heavily fact-dependent. In a number of cases where the shooting of a dog was held to be unreasonable, though, courts treat as important facts such as the dog being at least 10 feet away from the officer and/or the dog retreating. *See, e.g.*, *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 209 (3d Cir. 2001) (concluding that the shooting of the plaintiff's dog was unreasonable, where the officer "intentionally and repeatedly shot a pet without any provocation and with knowledge that it belonged to the family who lived in the adjacent house and was available to take custody" and where an independent witness had said that the dog was approximately ten to fifteen feet away from the officer, was not growling or barking, and was stationary); *Criscuolo v. Grant Cty.*, 540 F. App'x 562, 563 (9th Cir. 2013) (where the dog that was killed was stationary and was retreating, was at a distance of 10 to 20 feet from the officer and his police dog, and the dog's owner was one to two feet away

8

from the dog and about to leash him, it was a jury question as to whether the killing was reasonably necessary to protect the police dog); *Viilo v. Eyre*, 547 F.3d 707 (7th Cir. 2008) (where a dog had already been shot twice and hidden under a bush, and then had come out whimpering, limping, and trying to go to the back yard, away from the officer and toward its owner, the officer's shooting at the dog two more times was not reasonable). The facts in all those cases are a far cry from the facts here.

In this case, by contrast, Jax was indisputably very close to Roane. And although Ray insists she was "controlling" his lead, there is no allegation that Jax was calm or retreating. In similar circumstances, courts have held either that the officer's conduct was reasonable, and so there was no violation, or that qualified immunity applied. In *Stephenson v. McClelland*, 632 F. App'x 177 (5th Cir. 2015), for example, the court held that the officer was entitled to qualified immunity for his shooting of a dog. There, the officer got out of his car to approach a suspect, and as the suspect walked back to the house, a large dog appeared, startling the officer and showing its teeth. Although the person later said the dog was merely "smiling," the court ruled that qualified immunity applied because the officer "was forced to make a split-second judgment in a tense situation and he acted to protect himself." 632 F. App'x at 185. The court also cited to several other cases, including *Grant v. City of Houston*, 625 F. App'x 670, 674 (5th Cir. 2015), in which the court held an officer was entitled to qualified immunity where he shot a dog after being surprised when the dog showed its teeth and charged toward the officer's legs.

Similarly, in *Dziekan v. Gaynor*, 376 F. Supp. 2d 267 (D. Conn. 2005), the court held that the officer had acted reasonably and thus that no claim would lie on the plaintiff's version of the facts. According to the plaintiff, the officer approached a man and his 55 to 60-pound dog, who was not on a leash and was running toward the officer, probably at a rate of three feet per second.

9

The officer shot the dog when it was still approximately fifteen feet from defendant, or five seconds away based on the estimated speed. Again, the court noted that the situation called for "split-second decision-making" and that the officer acted reasonably. *Id.* at 272.

In another case factually similar to the situation here, *Warboys v. Proulx*, 303 F. Supp. 2d 111 (D. Conn. 2004), an officer and his police dog were tracking a suspect. They told a young man to go inside his house, and as he went to the house, a pit bull weighing 90 to 100 pounds, escaped through the door. The man tried to grab the dog, but failed. As the dog moved toward the officers, the man yelled "he won't hurt you," but an officer fired one shot into the dog's head, killing him. He was killed approximately 30 feet from the door of the house and 5 to 10 feet from the officer. The entire incident from the time the dog escaped until the shot occurred over a 5-second interval. The court accepted as true that the dog was not barking or growling, but was in a friendly mood with his tail wagging, and that he was a loving pet that had never attacked an animal or a person. Nonetheless, the court reasoned that the law did not require the officer "to wait until the approaching animal was within biting distance or was leaping at him before taking protective action." *Id.* at 119. The court also held that even if the act was unreasonable, the officer was entitled to qualified immunity. *Id.* at 119 n.14.

*McCarthy v. Kootenai Cty.*, No. 08-cv-294, 2009 WL 3823106 (D. Idaho Nov. 12, 2009), also involved a dog that was in the yard of his residence. There, a sergeant was serving process for a civil lawsuit, and he entered a fenced yard and walked about 200 yards up the hill. When he was 30 yards from the residence, he noticed a large German Shepherd in the yard. He began walking backwards slowly, but the dog alerted and starting charging towards the officer, followed by a second dog. The officer yelled for the dogs to stop, but they continued toward him barking and growling. The officer fired one shot at the German Shepherd, striking its head and

10

injuring it badly. The court held that he acted reasonably. The court noted that an officer "need not use the least harmful alternative in dealing with a dangerous situation in which officer safety is at issue." *Id.* at *6. It, too, noted that "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)).

Akin to the courts in many of the above cases, the court concludes that it was not unreasonable for Roane to shoot a 150-pound, "alarmed" and barking dog that had advanced on him, closing to within feet, all in a "short moment." Especially taking into account the strong interest in officer safety and Roane's need to make a quick decision in a tense situation, the court concludes that his actions were objectively reasonable.

For all of these reasons, the court will grant the motion to dismiss the Fourth Amendment claim on the grounds that the seizure was reasonable. In the alternative, Roane is entitled to qualified immunity, as the court discusses next.

**2. Roane is entitled to qualified immunity.**

Roane contends, in the alternative, that his actions as alleged by plaintiff entitle him to qualified immunity. Under the doctrine of qualified immunity, government officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Smith v. Gilchrist*, 749 F.3d 302, 307 (4th Cir. 2014); *Cloaninger v. McDevitt*, 555 F.3d 324, 331 (4th Cir. 2009). Ray has admitted that, at all relevant times, Roane was performing a

governmental function that involved judgment and discretion. (Reply to Answer ¶ 142.) Thus, he was performing discretionary functions. In that circumstance, an official will be protected by qualified immunity if his actions were objectively reasonable. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense." *Durham v. Jones*, 737 F.3d 291, 299 (4th Cir. 2013). It is important to resolve the issue of qualified immunity "early in the proceedings" because qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003).

Qualified immunity generally involves a two-step inquiry: (a) whether the plaintiff's allegations state a claim that the defendant's conduct violated a constitutional right; and if so, (b) whether that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). As already noted, the court does not believe that plaintiff's allegations support that Roane violated Ray's constitutional rights and thus qualified immunity is appropriate on that ground alone. The court also concludes that the second prong of the analysis, *i.e.,* whether the facts alleged show a violation of Ray's clearly established constitutional rights, also favors Roane.

As to this second prong, a law enforcement officer is not expected to know all of the legal limits of well-known constitutional rights; the officer is entitled to immunity if a reasonable officer would not have understood that what he is doing violates the plaintiff's constitutional rights. *Anderson*, 483 U.S. at 638–39. As stated by the United States Supreme Court in *Malley*, "if officers of reasonable competence could disagree" on whether the action was reasonable,

immunity should be granted. 475 U.S. at 341; *Springmen v. Williams*, 122 F.3d 211, 214 (4th Cir. 1997). Under this standard, all but the "plainly incompetent or those who knowingly violate the law" are protected. *Malley*, 475 U.S. at 341.

Since at least 2003—and thus including the time that Roane shot Jax—it was well established that, if an officer acted unreasonably in shooting a dog, it could constitute a seizure within the meaning of the Fourth Amendment. Specifically, *Altman v. City of High Point, N.C.*, 330 F.3d 194 (4th Cir. 2003), was the first Fourth Circuit case to hold that the shooting of a dog could constitute a Fourth Amendment seizure. The court there, however, held that the shooting deaths of four dogs in separate incidents by two animal control officers were *not* unreasonable seizures. In all of those incidents, the dogs were "at large" and not in a fenced-in yard or otherwise constrained by their owners. The court noted this fact as significant in determining that the officers' conduct was reasonable. 330 F.3d at 205–06; *id.* at 207 (distinguishing other cases on that basis).

But the court must "look not to whether the right allegedly violated was established 'as a broad general proposition' but whether 'it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted.'" *Raub v. Campbell*, 785 F.3d 876 (4th Cir. 2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001), *as modified by Pearson*, 555 U.S. 223). *See also Bailey v. Kennedy*, 349 F.3d 731, 741 (4th Cir. 2007) ("A right is 'clearly established' if the contours of the right are sufficiently clear so that a reasonable officer would have understood, under the circumstances at hand, that his behavior violated the right.") (citations and internal quotations omitted). Roane is entitled to qualified immunity, then, if a reasonable officer in his position would not have known it was "clearly" unreasonable to shoot Jax.

The reasonableness of a defendant's belief is judged from an objective standard in light of the clearly established law at the time of the defendants' exercise of discretion, *Anderson*, 483 U.S. at 639. Moreover, the court may not judge the reasonableness of the defendants' actions "with the benefit of 20/20 hindsight." *Id.*

For the same reasons that the court concluded Roane acted reasonably, a reasonable officer also would not have known it was "clearly" unreasonable to shoot Jax in these circumstances. At worst, this is a classic case of a "bad guess in a gray area," *Raub*, 785 F.3d at 991, or a "reasonable but mistaken judgment," *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citations omitted). Accordingly, Roane is entitled to qualified immunity.

**C. State-Law Claims of Conversion and Intentional Infliction of Emotional Distress**

Because the court is dismissing the only federal claim in the case, the court has discretion to decline supplemental jurisdiction over the state-law claims and to dismiss them without prejudice pursuant to 28 U.S.C. § 1367(c)(2). In exercising its discretion, the court must consider factors of judicial economy, convenience, fairness, and comity. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Generally, though, when a case in its early stages, courts will decline to exercise jurisdiction. 13 D Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*, (3d ed., April 2018 Update) ("The commonest example of when a court might decline supplemental jurisdiction is when the jurisdiction-invoking claim is dismissed relatively early in the proceedings."). Here, although the case has been pending for some time, no discovery has occurred (because it was stayed by the court), and so it will not save extensive judicial resources for the court to retain those other claims, as opposed to letting Ray re-file in state court if she so chooses. The court also sees no unfairness or inconvenience to either party from a dismissal without prejudice. The court finds that the comity factor also favors declining

14

jurisdiction because the remaining claims are state-law torts between two Virginia residents that occurred in Virginia. Thus, the state courts have a significant interest in resolving these types of claims.

For these reasons, the court declines to exercise jurisdiction over the state-law claims, and so they will be dismissed without prejudice.

**D. Motions for Sanctions and for Relief**

The court has considered Roane's motion for sanctions, but declines to impose sanctions in this case. First of all, to the extent Roane was seeking dismissal on qualified immunity grounds as a sanction, he has obtained a dismissal of the federal claim against him.

Second, although Roane argues that the claims here were unsupported and even contradicted by other facts, the court does not believe any mischaracterizations require sanctions. It is worth noting that this case involved the use of force that admittedly killed a pet. The court cannot say that the claim was frivolous.

The court agrees that there are inconsistencies between allegations in the complaint and other facts available to plaintiff's counsel, including the recording. By way of example only, in that recording—and contrary to the allegations in the complaint—Ray tells Roane:

- "If you'd come towards me he woulda bit you."

- She did not see the incident, had not seen Roane get out of the truck, and did not think he had gotten out until she heard the shot. (If true, this would contradict that Ray was summoning Jax and holding on to his lead and also contradict the complaint's references to Roane shooting Jax while Ray looked on.)

- Roane would not have known that the dog would not bite him.

Additionally, according to the investigative report into the incident conducted by the Sheriff's Department (as conveyed in a press report from the Office of the Commonwealth's Attorney,

15

which explains why Roane will not be prosecuted), Ray told the investigator that the dog "could snap that lead and actually get off it if he wants off of it at any time." (Dkt. No. 5-3, at 2.)

But Ray has addressed her statements on the recording and stated that they were false, repeatedly noting that her statements were given under duress and threat of arrest and a threat of a potential search of her house. (Reply to Answer ¶ 2.) It is not clear to the court that this assertion is entirely true. For example, some of the statements that are contrary to allegations in the complaint were made *after* Roane said in the recording that the officers would not be searching her house. Additionally, Ray's comment to the investigator occurred on a different day altogether. Nonetheless, on the record of this case, and assuming that there are adequate reasons for counsel to believe the statements on the recording were given under duress, the court does not believe any of the actions or allegations questioned by defendant warrant sanctions.

To the extent that the motion for sanctions is based on some of the out-of-bounds language in the complaint, however, the court cautions plaintiff's counsel, as it has in other cases, that the type of inflammatory language used in the complaint here will not be tolerated in this court. Given the court's dismissal of the complaint in its entirety, the court will not strike any portions of the complaint. It notes, however, that language contained in paragraph 3 (describing Roane's driving approach "like a bat out of hell, screeching to a halt"); paragraph 5 ("drunk and emboldened with power"), paragraph 1 ("blowing his brains out execution style"), and paragraphs 4, 39, 40 ("execution-style"), at a minimum, would fall within the type of inflammatory characterizations not appropriate for a federal complaint.

With regard to the motion for relief, which seeks dismissal on the grounds of qualified immunity, it has been rendered moot by the court's dismissal of the federal claim. Accordingly, that motion will be denied as moot.

16

III. CONCLUSION

For the reasons stated above, the court will grant defendant's motion to dismiss the Fourth Amendment claim, which will be dismissed with prejudice. The state-law claims will be dismissed without prejudice. The motion for sanctions will be denied, and the motion for relief will be denied as moot. An appropriate order will follow.

Entered: September 20, 2018.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge