IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| TINA RAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:17-cv-00093 |
| | ) | |
| MICHAEL ROANE, | ) | By: Elizabeth K. Dillon |
| | ) | United States District Judge |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This case arises out of an unfortunate incident where Deputy Sheriff Michael Roane shot

and killed Tina Ray's dog, a German Shepherd named "Jax."  Ray's primary claim is under the

Fourth Amendment for an unreasonable seizure.[1]  Previously, the court dismissed Ray's

complaint for failure to state a claim, but the Fourth Circuit reversed, holding that the complaint

plausibly stated a claim for an unconstitutional seizure of property for which defendant was not

entitled to qualified immunity.  *Ray v. Roane*, 948 F.3d 222 (4th Cir. 2020).

Now before the court are defendant's motion for summary judgment and motion to

exclude expert witness Roy Bedard.  (Dkt. Nos. 73, 75.)  Because the court finds that Roane's

shooting of Jax was not objectively unreasonable as a matter of law, defendant's motion for

summary judgment will be granted, defendant's motion to exclude will be dismissed as moot,

and judgment will be entered for Roane.

I.  FACTUAL BACKGROUND

**A.  Events Prior to Roane's Arrival**

---

[1] Plaintiff has abandoned her federal due process claim and her state law claim for intentional infliction of emotional distress.  The only claims remaining are plaintiff's Fourth Amendment claim and her state law conversion claim.  These two claims are addressed in this opinion.

On Sunday morning, September 24, 2017, Augusta County Deputy Sheriff Aaron Will went to Tina Ray's house to serve a warrant for her arrest for assault on a family member and a protective order, relating to an altercation she had with her husband.  (Ray dep. 50–53, 65–66, Dkt. No. 74-8; Will Dep. 10–11, Dkt. No. 74-4.)[2]  When he arrived, Deputy Will smelled marijuana in Ray's house.  (Ray Dep. 55–56; Hicks Dep. 11–12.)  Ray and her friends, Stephanie Hagy and Adam Hicks, had been smoking marijuana that morning.  (Nagy Dep. 67.)  Another man was present and doing work on the roof.  (Ray Dep. 35.)

Because of the marijuana and suspected drug activity, Deputy Will contacted Augusta County Deputy Sheriff Michael Roane for assistance.  (Will Dep. 15; Roane Dep. 15, 18.) Roane was a supervisor on a multi-jurisdictional drug and gang task force, as well as a Deputy Sheriff and Investigator in the Augusta County Sheriff's Office.  (Roane Decl. ¶ 2.)  While Roane had never met Ray and had never been to her house, he and Deputy Will had earlier discussed a potential knock-and-talk at Ray's residence because of information Roane had received about drug distribution and drug use at her house.  (Roane Dep. 37–39; Will Dep. 9–10, 15.)  Roane also knew that Deputy Will previously had an encounter with Ray when she appeared to be under the influence and was found to be in possession of prescription pills.  (Ray Dep. 48–49.)  Ray attributes this information to her husband's attempt to cause her trouble by telling everyone she is on drugs.  (Ray audio, Dkt. No. 74-22.)

On the day in question, Deputy Will asked Ray, Hagy, and Hicks to go outside with him, and he had the other person come down from the roof of Ray's house.  (Ray Dep. 61.)  Augusta County Deputies James Lotts, Scott Smith, and Christopher Kite arrived in separate vehicles to

---

[2] Deposition transcripts and declarations are located at Docket No. 74:  Exhibit 2 – Deputy Roane declaration; Exhibit 3 – Deputy Roane deposition; Exhibit 4 – Will deposition; Exhibit 5 – James Lotts deposition; Exhibit 6 – Scott Smith deposition; Exhibit 7 Christopher Kite deposition (missing page 11 found at Dkt. No. 84-2); Exhibit 8 – Ray deposition; Exhibit 9 – Stephanie Hagy deposition; and Exhibit 10 – Adam Hicks deposition.

assist Deputy Will before Roane arrived.  (Lotts Dep. 8; Smith Dep. 10; Kite Dep. 8–10.)  Ray

and the others at her house were told by the officers that another officer, from the drug task

force, was coming, so they waited outside around the picnic table for his arrival.  (Ray Dep. 64–

65; Hagy Dep. 22, 24; Hicks Dep. 13.)

**B.  Jax**

Jax was a seven-year-old, long-haired shepherd and weighed 150 pounds.  (Ray Dep. 79,

87, 126.)  He was protective of his owner and others with whom he was familiar.  (*Id.* at 33.)

While everyone awaited Roane's arrival, Jax was in his play area near a tree on a 25-foot zip line

device or trolley system strung high between two trees with a long lead connected to this device.

(*Id.* at 57–58.)  Ray acknowledged that she did not know of anyone else with such a system.  (*Id.*

at 189.)  This system, with which Hagy and Hicks were familiar having been to the house before

(Hagy Dep. 13–14; Hicks Dep. 8, 14–15), allowed Jax to go from one side of the yard to the

other and have access to doors on both sides of Ray's house (Hagy Dep. 14).

Ray posits that the line was visible on the tree near Jax, but she admits that the trees were

in full leaf and it was at least difficult to see portions of the device.  (Ray Dep. 171–72.)

Officers, who were waiting on scene for Roane's arrival with Ray, her friends, and the dog, did

not realize the dog was on a zip line.  As Deputy Will testified, when he arrived at the house, he

"noticed there was a large German shepherd dog that was—I thought was tied to the tree right

beside the house."  (Will Dep. 11.)  He did not see the zip line device before the incident.  (*Id.*

13.)  Deputy Smith described it as a clear clothesline type line high in the air (Smith Dep. 21)

and stated, "I did not see the lead until after all this occurred . . . there is a—it was, like, strung

between two trees high in the air . . . you wouldn't have seen it from the ground unless you were

specifically looking for it." (Smith Dep. 21–22.)  Deputy Kite saw a lead, but he could not tell if

it was tied.  (Kite Dep. 9.)

As Ray later admitted to the Sheriff and confirmed at her deposition, Jax had gotten off

his lead before (Ray Dep. 124), and he could snap that lead and get off it anytime if he had

wanted off (*id.* at 149).

## C.  Roane Arrives

Roane was at home when he received an unexpected call from Deputy Will that morning

to assist at Ray's house.  (Roane Decl. ¶ 4.)  Roane had never been to the house before, and he

responded, wearing plainclothes and with his handgun, about 30–40 minutes later, driving his

office-provided pick-up truck with heavily tinted windows that were rolled up.  (*Id.*; Roane Dep.

16, 17, 26, 28; Ray Dep. 95–96.)  When he arrived, he saw that there were several police cars in

the driveway and an unmarked police car that appeared to be in a grassy area near a picnic table

where people were sitting.  (Roane Dep. 19.)  There were also other vehicles in the grass and on

the property.  (*Id.*)  He pulled into the left of the police cars parked in the driveway to the grassy

area adjacent to the driveway to be nearer the people around the picnic table, so he could

interview everyone separately in the pick-up truck cab.  (Roane Decl. ¶ 3, Ex. A; Roane Dep.

77–78.)  He unknowingly parked his truck underneath Jax's zip line.  (Ray Dep. 66; Hicks Dep.

16; Hagy Dep. 30.)

As he was pulling in, Roane briefly saw a large German shepherd dog sitting next to a

tree.  (Roane Decl. ¶ 6; Roane Dep. 19, 50.)  He thought the dog was tied to the tree with a leash.

(Roane Dep. 23.)  The tree was on the passenger side of the pick-up truck when Roane parked,

and Roane thought the dog was far enough away to be beyond his reach when he exited his truck

from the driver's side.  (*Id.* at 24; Roane Decl 3, Ex. A.)  Roane did not see the zip line and did

not know he had parked in Jax's play area.  (Roane Dep. 19–20, 76–77; Roane Decl 10–11; Ray Dep. 58, 78–79.)  Ray admits that Roane would not have known that it was Jax's play area.  (Ray 231.)

**D.  Jax Alerts And Goes After Roane; Roane Shoots And Kills Jax**

While the witnesses accounts of the interaction between Roane and Jax vary slightly, everyone agrees that Jax became alarmed and took off either when Roane's truck pulled up under the tree or when Roane exited the driver's side of his vehicle.  Jax went after Roane and was barking and/or growling and/or woofing.  (Ray Dep. 71 and Hagy Dep. 31, 33 (dog running and barking); Hicks Dep. 19 (couple of woofs); Kite Dep. 12 (dog chasing Roane and moving pretty quick); Kite Dep. 13 (barking and growling); Lotts Dep. 10 (barking and growling, running and jumping up); Smith Dep. 14 (growling); Will Dep. 19 (barking and growling).)  People were yelling at and/or about the dog (Ray Dep. 30, 71 (let her get the dog); (Hagy Dep. 34 (Ray yelling and trying to get the lead); Ray Dep. 31 (Ray yelling "Jax, Jax"); (Hagy Dep. 28 (people screaming "The dog, the dog" after Jax took off); Hicks Dep. 16 (all yelling "Stop, stop, stop" because Jax was up and approaching); Hicks Dep. 17 (Hicks thought "hey, get back in the car – jump on back of truck").)  Meanwhile, Roane was running or walking backward or backpedaling past the back end of his truck.  (Hagy Dep. 35, Lotts Dep. 10, and Ray Dep. 31 (running backwards); Hicks Dep. 20 (walked steadily backwards; hard to describe); Kite Dep. 13 and Smith Dep. 15 (backpedaling).)  Roane fired one shot, and Jax collapsed and died.  (Roane Dep. 34.)  Everyone also agrees that the events transpired very quickly – in a matter of seconds. (Ray Dep. 28–29 (happened quickly, matter of few seconds); Ray Dep. 32 (between truck stop and gunshot, a few seconds); Hagy Dep. 63 (happened very quick); Hicks Dep. 21 ("a couple

minutes tops"[3] and "[i]t was fast.  It all seemed like it went (witness snaps fingers)"); Lotts Dep. 14 (5 seconds between arrival and shot); Kite Dep. 17 (seconds); Roane Decl. ¶ 5 (a few seconds after got out of truck).)

On the day of the incident in a recorded conversation, Ray told Roane that she saw Jax come around the truck, but she thought Roane was still in the truck.  Then she heard a gunshot and did not know what it was.  (Ray Dep. 26 (playing audio); Ray audio.)  At her deposition, she testified to a more detailed version of the events.  She stated that when the dog rounded the truck, she heard officers shouting, "Let her get the dog!", so she ran to get the end of the lead.  (Ray Dep. 30.)  Roane was running backward with Jax chasing him.  (*Id.*)  Jax was running and barking.  (*Id.* at 71.)  She was hollering at the dog and grabbed the lead with her right hand up in the air.[4]  (*Id.* at 31, 188.)  Ray, who only weighed 130 pounds at the most, was not strong enough to pull the dog back.  (*Id.* at 45, 165.)  She pulled on the lead the whole time until Jax was on the ground.  (*Id.* at 86–87.)  She could feel the dog pulling the whole time.  (*Id.* at 87.)  She never saw Roane draw his weapon (*id.* at 226), and she could not see Jax's face (*id.* at 89), but Jax was within one step of Roane when the shot was fired (*id.* at 155).

According to Roane, once he got out of the truck, the dog immediately came charging at him from around the front of the truck.  (Roane Dep. 29.)  Jax was growling, barking, and chomping and baring its teeth aggressively and in attack mode trying to bite him.  (*Id.* at 29, 31.)  Roane began running backward as fast as he could.  (*Id.* at 31.)  Roane thought the dog had broken its leash and was no longer tied to the tree.  (*Id.* at 30; Roane Decl. ¶ 6.)  The dog

---

[3]  Hicks, who admits he was not really paying attention, includes in his estimate the time between the truck pulling into the yard and the firing of the shot, and he notes that it took Roane about one minute to exit the truck. (Hicks Dep. 19, 21.)

[4]  Hagy testified that she does not think Ray ever got hold of the lead.  (Hagy Dep. 63.)

continued chasing Roane, and when the dog had closed to within inches and was still chasing

Roane backward beyond the rear of the truck, Roane fired one shot.  (Roane Dep. 31–35.)  The

dog collapsed and died.  (*Id.*)

**E.  Observations At The Time The Shot Was Fired**

      Roane had been running or backpedaling away from Jax down the driver's side of the

truck and was behind the truck and facing Jax when the shot was fired.  (*Id.* at 34.)  Hagy and

Hicks were at the picnic table off to the passenger side front of the truck.  (Hagy Dep. 17–19;

Hicks Dep. 13.)  Roane and Jax were very close to each other when the shot was fired.  (Roane

Dep. 34–35 (inches away); Ray Dep. 155 (within one step); Hicks Dep. 23 (no more than one

foot between dog's head and Roane); Hagy Dep. 36 (couple of feet).)  According to Hagy, Jax

was still barking.  (Hagy Dep. 35.)  The witnesses who were familiar with the zip line device

testified that Jax was at the end of the lead when Roane fire the shot and that he took a step

toward Jax before firing.  (Ray Dep. 78 ("it seemed like" Roane stepped back toward the dog);

Hagy Dep. 35–36; Hicks Dep. 17, 20–21.)  Witnesses unfamiliar with the zip line system, did not

observe that Jax was at the end of his lead or see a step forward.  (Kite Dep. 16 (Jax still moving

forward when shot); Smith Dep. 15 (heard one shot and Roane continued to backpedal and dog

continued and then collapsed).)  According to Roane, the dog was still coming toward him

(Roane Dep. 61) and was "right at me, chomping and growling and attacking me, and I shot the

dog," (Roane 20).  He thought Jax must have broken free from whatever tied him to the tree.

(Roane Decl. ¶ 6.)  Furthermore, he feared serious injury (Roane Decl. ¶ 6) as he saw no one and

nothing controlling Jax (Roane Decl. ¶ 9) and his experience taught him that some drug dealing

operations had dogs trained to attack to protect the operation (Roane Decl. ¶ 7).  Hagy noted that

Jax became more aggressive after seeing Roane's gun.  (Hagy Dep. 35.)  Roane's fears were also

noted by Hicks when he initially stated that he saw what he believed to be fear on Roane's face at the time the gun was fired.[5]  (*Id.* at 37.)

Following the shooting, Roane examined the zip line trolley system, the likes of which he had not seen before, and determined that "there was still much more slack that the dog could have used to keep coming at me and attack me."  (Roane decl. ¶ 11.)  Additionally, Ray admitted that she does not know whether the lead could have slid along the zip line a little further one way or the other when the shot was fired.  (Ray Dep. 136, 175–76.)  She also recognized that Roane did not come to her house to shoot her dog but that it was a spontaneous thing that happened.  (*Id.* at 150.)  Hagy also acknowledged that Roane told her he felt threatened when she asked him why he shot Jax.  (*Id.* at 38.)

## II.  ANALYSIS

### A.  Summary Judgment

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party.  *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party makes this showing, however,

---

[5] Hicks then noted that he was not sure that he could see Roane's face.  (Hicks Dep. 37.)

the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), 56(e). All inferences must be viewed in a light most favorable to the non-moving party, but the nonmovant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

**B.  Fourth Amendment**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Plaintiff has the burden to satisfy the required elements of her Fourth Amendment claim: an (1) unreasonable (2) seizure (3) by a government actor. *Monroe v. City of Charlottesville*, 579 F.3d 380, 386 (4th Cir. 2009). There is no dispute that Jax was seized. The only question is whether plaintiff has come forward with sufficient evidence of a genuine issue of material fact regarding the objective unreasonableness of the seizure. *Id.* Whether a seizure was unreasonable is an "objective determination," and based on the "facts and circumstances confronting [the officer] without regard to [his] underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Also, the officer's conduct "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

In analyzing the reasonableness of the seizure, the court must balance the highly significant private interests that an individual has with her pet, with the government's strong public interest in protecting officers from dogs that may be dangerous. *See Ray*, 948 F.3d at 227 (citing and quoting *Altman v. City of High Point, N.C.*, 330 F.3d 194, 205 (4th Cir. 2003)). "The task of this court is to put itself into the shoes of the officers at the time the actions took place

9

and to ask whether the actions taken by the officers were objectively reasonable." *Altman*, 330 F.3d at 205. This analysis must also "embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Ray*, 948 F.3d at 227 (citing *Altman*, 330 F.3d at 205 (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)).

A review of the evidence, in a light most favorable to Ray, reveals that Roane parked his truck under the zip line / trolley system to which Jax was attached and, unbeknownst to Roane, in Jax's play area. Roane and some other officers did not see this system, that was high in the trees and at least partially obscured by the trees in full leaf, until after Jax was shot. Jax was alarmed by the truck and/or the driver's side door opening and closing when Roane pulled up, so he growled and/or barked and/or woofed at Roane and went after him in a walk or run. Everyone on the scene, including Roane and Ray, perceived the threat that Jax, a very large dog, posed to Roane as people were yelling warnings about the dog and yelling at the dog to get him to stop. Ray ran to grab the lead and could feel Jax pulling on it the entire time, but the dog was too strong for her. She could not control Jax. Hicks thought Roane should get back in the truck or on the truck. Roane backpedaled away from Jax with a look of what might have been fear on his face. In a matter of seconds, or in the snap of one's fingers, and with very little distance between Roane and Jax, Roane fired one shot that killed Jax. There is no indication that Roane had time to surveil the area while retreating from Jax to consider his options.

When standing in Roane's shoes, a reasonable officer sees a large dog, in the yard of a home of a suspected drug dealer, coming after him and appearing to be unrestrained. The dog continues, uncontrolled by Ray's words or efforts, while Roane retreats in fear. Roane, fearing serious injury, makes a split-second decision and fires one shot, killing the dog.

10

While a few witnesses who were familiar with the zip line system concluded that Jax was at the end of his lead when Roane took one step forward and fired his weapon, no one was standing where Roane was standing or behind him. No one indicated how Roane, who did not know about or see the lead, would have known that the lead ended and that Jax had reached the end of it. Finally, no one checked the lead following the incident except Roane. Roane observed that there was much more slack in the line to allow Jax to continue toward him. Ray admitted that she did not know if the lead could have slid further along the zip line when the shot was fired. And she acknowledged that she does not know what Roane saw or thought at the time because she was not in his position—she could not see Jax's face. Furthermore, there is no evidence that the threat to Roane ended before the shot was fired. Indeed, Jax had gotten off his lead before and he "could snap that lead and actually get off of it if he wants off of it anytime."

Given the undisputed facts, no reasonable jury could find a Fourth Amendment violation. As the Fourth Circuit noted in a previous case involving an officer threatened by dogs, "[t]he 'critical reality'" is that the officer "did not even have a chance to pause and consider his options," or "pause and ponder" the many factors that would affect how much of a threat was posed without "risking losing the last chance to defend" himself. *Lee v. Fort Mill*, 725 F. App'x 214, 216 (4th Cir. 2008). Such was the case here.

For these reasons, the court finds that Roane's seizure of Jax was reasonable under the Fourth Amendment.[6]

## C. State Law Conversion

In Virginia, "[a] person is liable for conversion for the wrongful exercise or assumption of authority over another's goods, depriving the owner of their possession, or any act of

---

[6] Because of this ruling, the court does not address defendant's qualified immunity argument.

dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's rights."

*Simmons v. Miller*, 544 S.E.2d 666, 679 (Va. 2001).  For the reasons already stated, Roane's

exercise of control over Jax was not wrongful.  Rather, he was acting to protect himself from the

threat posed by Jax.  Thus, the court will grant summary judgment on this claim.

## III.  CONCLUSION

For the reasons stated above, the court will issue an appropriate order granting Roane's

motion for summary judgment, dismissing Roane's motion to exclude expert testimony as moot,

and granting judgment to Roane.

Entered: September 27, 2022.

/s/ Elizabeth K. Dillon

Elizabeth K. Dillon
United States District Judge